**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:18-cr-031 |
| | : | |
| vs. | : | Judge Timothy S. Black |
| | : | |
| DEON SANDERS, | : | |
| | : | |
| Defendant. | : | |

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**

This criminal case is before the Court on Defendant's motion to suppress (Doc. 18) and the Government's response in opposition (Doc. 20).

On May 8, 2019, this Court held a hearing on Defendant's motion, at which time the Court heard the testimony of Defendant's witness, Ms. Reja Faulkner, as well as the Government's witnesses, Officer Kerri Maloney and Lt. David Schofield. (Min. Entry, May 8, 2019). The Court ordered the preparation of a transcript (Doc. 24) and subsequently received post-hearing briefs from the parties. (Docs. 25, 26, 27). The motion is now ripe for decision.

## I. BACKGROUND

On March 7, 2018, Defendant Deon Sanders was charged by way of a single-count indictment with possession of a firearm by a prohibited person, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Doc. 7).

The charge arises from evidence seized during the search of Apartment #2 at 550 Ringgold Street in Cincinnati, Ohio. (Doc. 18). Defendant moves for suppression of the evidence, arguing that officers of the Cincinnati Police Department ("CPD") did not

obtain proper consent before conducting a warrantless search of the Ringgold apartment. (*Id.*)

For purposes of this Order, the Court will rely upon the facts as set forth in the parties' pre- and post-hearing briefs (Docs. 18, 20, 25, 26, 27), as well as the testimony and evidence proffered at the May 8, 2019 suppression hearing (Doc. 24).[1]

## II. FACTS

On November 14, 2017, CPD officers responded to a report of shots fired in the area of Highland and Ringgold Street in Cincinnati, Ohio. (Doc. 18 at 1). Officer Kerri Maloney and Lt. David Schofield were the first to arrive, joined thereafter by a number of other CPD officers, including Officers Herrmann, Horner, and Ventre. (Doc. 24 at 34).[2] Upon arrival, Officer Maloney and Lt. Schofield observed a female passenger sitting in a maroon Cadillac, with the engine running, in the alleyway in front of 550 Ringgold Street. (Doc. 20 at 2). The officers then observed a man exiting Apartment #2 of 550

---

[1] The Government offered two exhibits, which were admitted during the suppression hearing: a CD containing the body-worn camera footage of CPD Officers Herrmann, Horner, and Ventre (Gov. Ex. 1); and a signed consent to search form for the Ringgold apartment (Gov. Ex. 2). For purposes of this Order, citations to the body-worn camera footage will appear with the name of the officer, followed by the approximate minutes and seconds.

At the hearing, Defendant offered two exhibits for purposes of impeachment, both of which were admitted into evidence: a Safe Streets Unit Investigative Report (Def. Ex. A) and a CPD Trial Preparation Report (Def. Ex. B).

The parties' exhibits have not been electronically filed on the docket, but are part of the record and remain in the Court's custody.

[2] Due to the CPD's policy at the time, neither Officer Maloney nor Lt. Schofield had body-worn cameras. (Doc. 24 at 36-37). Thus, all of the footage from the night of November 14, 2017 was captured on the cameras worn by Officers Herrmann, Horner, and Ventre. (*Id.*)

Ringgold Street. (*Id.*) The man was ultimately identified as Demetrice Cook. (Doc. 24 at 35). As the officers questioned Mr. Cook, they observed the female vehicle passenger, later identified as Defendant's girlfriend Reja Faulkner, exit the vehicle and enter Apartment #2. (Doc. 20 at 2).[3] Ms. Faulkner emerged from the apartment a short while later and was observed locking the door behind her with a key. (*Id.*; Doc. 24 at 35). Officer Maloney and Lt. Schofield then made contact with Ms. Faulkner as well. (*Id.* at 35-36).

Ms. Faulkner informed the officers that she lived at the Ringgold apartment and that she had been sitting in the Cadillac, smoking marijuana with her boyfriend, when she heard shots fired. (Herrmann, 11:35). She told officers that her boyfriend, Defendant Deon Sanders, had since gone inside the apartment and that she did not know the other man who had previously exited the home. (*Id.*)[4] During the hearing, Ms. Faulkner testified that the Ringgold apartment was not Defendant's primary residence, nor was Defendant a party to the lease agreement. (Doc. 24 at 6-7). Nonetheless, Ms. Faulkner explained that Defendant was a frequent overnight guest at the Ringgold apartment, that

---

[3] Ms. Faulkner testified that she and Defendant are still in a relationship and that they now have a newborn child together. (Doc. 24 at 14-15).

[4] At the hearing, Ms. Faulkner testified that she did in fact know Mr. Cook, whom she referred to as "Miko," and that Mr. Cook had been in the backseat of the vehicle when officers arrived. (Doc. 24 at 8, 20). However, Mr. Cook told officers at the scene that he had no involvement in the incident, knew nothing of the shots fired, and was simply walking through the alley on his way home from the casino when the police arrived. (Herrmann, 4:30). Moreover, Defendant told officers that he had been in the apartment, "knocked out" sleeping, when the shots were fired. (*Id.* at 25:50).

he had his own key, kept his clothes there, and had permission to come and go at his leisure. (*Id*. at 7).

At the scene, Ms. Faulkner also told officers that she held a concealed carry permit and owned three firearms, including a rifle. (Doc. 24 at 20, 45; Horner, 19:30). Ms. Faulkner's disclosure was notable, as Lt. Schofield had located six rifle shell casings in the alleyway, close to the entrance of the Ringgold apartment. (*Id*.) Accordingly, Officer Maloney took Ms. Faulkner aside to ask for consent to search the Ringgold apartment. (Herrmann, 12:00-13:45).

Officer Maloney testified at the hearing that her decision to stand just outside the Ringgold alleyway when speaking with Ms. Faulkner was, in part, an effort to place herself in a better tactical position. (Doc. 24 at 39, 57-58). Officer Maloney also explained that she chose to speak with Ms. Faulkner away from other officers because "then the intimidation factor goes down." (*Id*. at 60). Moreover, Lt. Schofield testified that he remained within earshot at all times, although he may not have heard every word spoken. (*Id*. at 87).

After speaking to Ms. Faulkner, Officer Maloney approached Lt. Schofield and explained, <u>in Ms. Faulkner's immediate presence</u>, that Ms. Faulkner had a rifle and two additional firearms in the apartment, that Ms. Faulkner was going to try to call Defendant out of the apartment, and that Ms. Faulkner had given the officers permission to go into the apartment once Defendant had exited. (Herrmann, 13:22-13:45; Ventre, 11:36-11:53). Ms. Faulkner did not protest, correct, or otherwise attempt to qualify any aspect of Officer Maloney's statement. (*Id*.)

As discussed, Ms. Faulkner and the officers then approached the door of the Ringgold apartment, where Ms. Faulkner proceeded to call out to Defendant in an effort get him to exit the home. (*Id*. at 12:05-12:50). However, Ms. Faulkner quickly became agitated by Defendant's slow response and apparently took a step into the doorway, prompting Lt. Schofield to grab Ms. Faulkner's hooded sweatshirt in an effort to keep her from entering the apartment. (*Id*. at 12:25-12:50; Doc. 24 at 84). Ms. Faulkner responded by calling to Defendant: "They pullin' on my hoodie and stuff. Come on." (Ventre, 12:25-50). Ms. Faulkner then told Lt. Schofield that she felt as if she was being choked, that she was uncomfortable and nervous, and that she just wanted Defendant to come out. (*Id*.) Lt. Schofield explained to Ms. Faulkner that he was just trying to "make sure [she is] safe." (*Id*. at 12:38).

Defendant ultimately walked outside and the officers prepared to enter the Ringgold apartment. (*Id*. at 12:50). At that time, in Defendant's presence, Ms. Faulkner expressed hesitation about the search and questioned the officers as to whether they "are allowed to do this; just go in there with the baby in there." (*Id*. at 17:25). Officer Maloney explained that the officers were permitted to enter in light of Ms. Faulkner's prior consent, in response to which Ms. Faulkner again expressed concern for her two-year old daughter sleeping upstairs and stated that she had never given consent and that she "didn't say yes or no." (*Id*.) Despite this statement, Ms. Faulkner then asserted that no one had ever asked for consent at all, but explained to the officers: "If you just ask me, I could say yes or no. My daughter [is] up there, that's all I'm saying. And I would like to come with." (*Id*. at 18:01-18:09).

As the officers were speaking to Ms. Faulkner, Officer Herrmann approached and informed Lt. Schofield and Officer Maloney that Defendant had an outstanding probation violation, as well as prior felony convictions for drug trafficking. (Hermann, 21:20). In light of this information, as well as Ms. Faulkner's recent hesitation to the search, Lt. Schofield asked Officer Maloney to take Ms. Faulkner aside and speak to her again, outside the presence of Defendant and the other officers. (*Id*.)

While Officer Maloney was speaking with Ms. Faulkner, Lt. Schofield explained to Officer Herrmann that, given Defendant's felony convictions and his knowledge of the firearms in the apartment, the officers could obtain a warrant for the home. (*Id*. at 21:47). However, Lt. Schofield stated that he would "hate to go that route," in light of the fact that Ms. Faulkner had previously given consent to search. (*Id*.) Lt. Schofield stated that Ms. Faulkner appeared concerned for the two-year old child, who was still asleep in the house. (*Id*.) At the suppression hearing, Ms. Faulkner acknowledged that her hesitation was because of her daughter. (Doc. 24 at 28). However, as Lt. Schofield explained to Officer Herrmann, he believed that Ms. Faulkner would once again agree to the search once Officer Maloney had a chance to speak to her outside the presence of other officers. (Herrmann, 21:47). Lt. Schofield then approached Officer Maloney and Ms. Faulkner. (Horner, 1:00). Lt. Schofield testified that, particularly as to this second conversation, he wanted to remain within earshot to be sure there was no further confusion. (Doc. 24 at 87-88).

After speaking with Ms. Faulkner for a few minutes, Officer Maloney confirmed with Ms. Faulkner, in the presence of Lt. Schofield and Officer Horner: "So you're going

to allow us to go in and [inaudible] the firearms?" (Horner, 1:00-1:15). Ms. Faulkner agreed. (*Id*.) Lt. Schofield testified that he was certain of Ms. Faulkner's consent to search and that, if there had been any doubt in his mind, he would have sought a search warrant. (Doc. 24 at 88-89).

During the suppression hearing, Officer Maloney testified that, in securing Ms. Faulkner's consent for the second time, she explained to Ms. Faulkner that the officers had the option to either obtain a warrant or that Ms. Faulkner could consent to the search for the firearms. (*Id*. at 44). Ms. Faulkner also testified that Officer Maloney did in fact explain that the officers had the option to seek a warrant. (*Id*. at 24). Additionally, Officer Maloney testified that Ms. Faulkner's "main concern was the child upstairs," and that Ms. Faulkner "wasn't completely understanding that we had to go in by ourselves." (*Id*. at 44). Given those concerns, Officer Maloney explained to Ms. Faulkner the various safety reasons for why the officers needed to enter alone and, "[a]t that time [Ms. Faulkner] understood and gave [the officers] consent." (*Id*.) Ms. Faulkner also told Officer Maloney the specific locations of all three firearms. (*Id*. at 70; Ventre, 27:32-27:42). Notably, with regard to the rifle, Ms. Faulkner asked Defendant, in the presence of the other officers, where the firearm was located, to which Defendant responded that he thought the rifle was in the bedroom, but was uncertain. (Herrmann, 22:55).

Having secured Ms. Faulkner's consent, the officers again prepared to enter the Ringgold apartment. (Ventre, 22:30). Only then did the officers learn that Ms. Faulkner had failed to disclose the presence of yet another adult male, who was present in the

Ringgold apartment the entire time.  (*Id*. at 23:00-24:30).[5]  After the man exited the apartment, the officers entered and conducted a protective sweep.  (Doc. 24 at 85).  Thereafter, the officers commenced the search, at which time Officer Maloney notified Lt. Schofield and Officer Herrmann of the probable locations of all three firearms, stating: "dresser, fridge, and she [Ms. Faulkner] thinks under the couch.  She had to ask him [Defendant] where [the rifle] was at, and he [inaudible] in here but he didn't know." (*Id*. at 85-86; Ventre, 27:32-27:42).  Within seconds, Lt. Schofield spotted one of the firearms sitting on top of the refrigerator, nearly at his eye-level.  (*Id*.)  Subsequently, the officers also located the rifle and another firearm in Ms. Faulkner's bedroom closet. (Doc. 24 at 70, 85-86).  All three firearms were seized and, as the officers came to learn, one of the handguns was reported stolen.  (*Id*. at 71).

After the search, Officer Maloney was able to locate a consent to search form, which form she asked Ms. Faulkner to execute.  (*Id*. at 47-48).  Ms. Faulkner signed the form without objection.  (*Id*.)  Ms. Faulkner also received a copy of the fully executed consent form, which included an inventory of the items seized—*i.e.*, all three firearms and ammunition.  (*Id*. at 68; Gov. Ex. 2).  Again, Ms. Faulkner did not object to any aspect of her consent.  (Doc. 24 at 47-48).

However, at the suppression hearing, Ms. Faulkner testified that she had only given officers permission to retrieve the rifle, but not the remaining firearms.  (*Id*. at 11-13, 29).  Moreover, Ms. Faulkner testified that, during both of the semi-private

_____

[5] The individual was later identified as Robert Turnage.  (Doc. 24 at 119).  The officers confirmed that, similar to Defendant and Mr. Cook, Mr. Turnage had a felony record.  (*Id*.)

conversations, Officer Maloney told her that if she refused to consent to the search, "someone was going to have to get custody of [Ms. Faulkner's] kids because [Officer Maloney] was going to take [her] downtown." (*Id*. at 11). Ms. Faulkner testified that she consented to the search only because she had no one to pick up her children at the time. (*Id*. at 12). On cross-examination, Ms. Faulkner testified that Officer Maloney very specifically used the language: "We will take your children away from you." (*Id*. at 24). Conversely, Officer Maloney testified that she did not coerce Ms. Faulkner's consent nor did she threaten to take Ms. Faulkner's children away from her. (*Id*. at 48).

### III.  STANDARD OF REVIEW

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures …." U.S. Const. amend. IV.  "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted).

"The exclusionary rule prohibits the admission of evidence seized in searches and seizures that are deemed unreasonable under the Fourth Amendment, as well as derivative evidence acquired as a result of an unlawful search." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)).  The exclusionary rule serves to deter law enforcement from obtaining evidence by unconstitutional means. *Nix v. Williams*, 467 U.S. 431, 442-43 (1984).  So critical is the goal of deterring violations of constitutional and statutory

protections that exclusion is the appropriate remedy "notwithstanding the high social cost of letting persons obviously guilty go unpunished for their crimes." *Id*. at 443.

A defendant may seek the suppression of evidence by filing a pretrial motion with the court. Fed. R. Crim. P. 12(b)(3)(C). "It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Patel*, 579 F.App'x 449, 453 (6th Cir. 2014) (citing *United States v. Rodriguez–Suazo*, 346 F.3d 637, 643 (6th Cir. 2003)). However, "[t]he Government has the burden of proof to justify a warrantless search." *United States v. Haynes*, 301 F.3d 669, 677 (6th Cir. 2002); *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971) ("The burden is on those seeking the exemption to show the need for it") (quotation marks and citations omitted).

## IV.  ANALYSIS

As an initial matter, Defendant argues that, as a frequent overnight guest of the Ringgold apartment, he has standing to contest the search. (Doc. 18 at 2-3). Moreover, Defendant argues that Ms. Faulkner did not voluntarily consent to the search of the apartment, nor did CPD officers obtain consent from Defendant, who was present at the time of the search. (*Id*. at 4-6). In his post-hearing brief, Defendant further asserts that, even if Ms. Faulkner's consent was valid, it was limited in scope to a search for the rifle only. (Doc. 26 at 5-6). Accordingly, Defendant argues that the seizure of the additional firearms exceeded the scope of Ms. Faulkner's consent. (*Id*.) Moreover, Defendant argues that the officers lacked probable cause to conclude that the firearms were contraband and, accordingly, seizure under the plain view doctrine is unwarranted. (*Id*.)

As stated below, the Court finds that, while Defendant has standing to contest the search, Ms. Faulkner gave full, valid consent, and suppression is therefore unwarranted.

## A. Standing

"'The Fourth Amendment <u>protects people, not places</u>,' and provides sanctuary for citizens wherever they have a legitimate expectation of privacy." *Minnesota v. Olson,* 495 U.S. 91, 96 n. 5 (1990) (quoting *Katz*, 389 U.S. at 351) (emphasis added). "Because Fourth Amendment rights are 'personal,' the central inquiry in any suppression hearing is whether the defendant challenging the admission of evidence has shown a legitimate expectation of privacy in the place searched or the thing seized." *United States v. Waller*, 426 F.3d 838, 843 (6th Cir. 2005) (quoting *Rakas v. Illinois,* 439 U.S. 128, 143 (1978)).

Defendant bears the burden to show a legitimate privacy interest in the place searched or thing seized. *United States v. Whitehead,* 415 F.3d 583, 587 (6th Cir. 2005). To satisfy this burden, Defendant must show: **first**, that he "by [his] conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that he sought to preserve something as private"; and **second**, that the "expectation of privacy is one that society is prepared to recognize as reasonable." *Waller*, 426 F.3d at 844.

The Court must make a case-by-case determination as to whether a legitimate expectation of privacy exists in a particular place or thing. *Id.* In making this determination, the Court may consider a number of factors, including:

> the person's proprietary or possessory interest in the place to be searched or item to be seized; whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; whether he has exhibited a subjective expectation that the area would

> remain free from governmental intrusion; and whether he was
> legitimately on the premises.

*Id*. In short, for a subjective expectation of privacy to be legitimate, it "must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Rakas*, 439 U.S. at 143 n.12.

Notably, the Sixth Circuit "generously construe[s] the Fourth Amendment as protecting nearly all overnight guests, even when the guest occupies a common area in the apartment that is not private from other residents." *United States v. Washington*, 573 F.3d 279, 283 (6th Cir. 2009) (citing *United States v. Pollard*, 215 F.3d 643, 647 (6th Cir. 2000)).

Here, although the Ringgold apartment was not Defendant's primary residence, he was a frequent overnight guest, he had his own key to the apartment, he kept his clothes there, and he had permission to come and go at his leisure. (Doc. 24 at 7). Under the circumstances, the Court finds that Defendant has standing to contest the search.

### B. Consent

"Consent [is] a 'specifically established exception[ ] to the requirements of both a warrant and probable cause' … [and] is constitutionally sufficient" *United States v. Eastman*, 645 F. App'x 476, 479 (6th Cir. 2016) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973)). However, consent is only valid if it was freely and voluntarily given. *United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2008) (citing *Bumper v. North Carolina,* 391 U.S. 543, 548 (1968)). "'It is the Government's burden, <u>by a</u>

preponderance of the evidence, to show through 'clear and positive testimony' that []

valid and voluntary consent to the search was obtained." *United States v. Worley*, 193

F.3d 380, 385 (6th Cir. 1999) (collecting cases) (emphasis added); *United States v. Lucas*,

640 F.3d 168, 174 (6th Cir. 2011).

"Consent is voluntary when it is 'unequivocal, specific and intelligently given,

uncontaminated by any duress or coercion.'" *Moon*, 513 F.3d at 537(citing *United States*

*v. McCaleb,* 552 F.2d 717, 721 (6th Cir. 1977)).  Coercion, whether by "explicit or

implicit means, by implied threat or covert force," renders consent involuntary.

*Schneckloth*, 412 U.S. at 228.  Further, consent must have been the product of more than

mere acquiescence or submission to law enforcement's demands or authority.  *United*

*States v. Canipe*, 569 F.3d 597, 602-04 (6th Cir. 2009).

"[W]hether a consent to a search was in fact 'voluntary' or was the product of

duress or coercion, express or implied, is a question of fact to be determined from the

totality of all the circumstances." *Schneckloth*, 412 U.S. at 227 (emphasis added).  Thus,

the Court's decision does not "turn[] on the presence or absence of a single controlling

criterion…." *Id*. at 226.  Some of the relevant factors the Court should consider include,

"'the age, intelligence, and education of the individual; whether the individual

understands the right to refuse to consent; whether the individual understands his or her

constitutional rights; the length and nature of detention; and the use of coercive or

punishing conduct by the police." *United States v. Bond*, 433 F. App'x 441, 443 (6th Cir.

2011) (quoting *Worley*, 193 F.3d at 386).

Additionally, even "[w]hen law enforcement officers rely upon [valid] consent as the basis for a warrantless search, the scope of the consent given determines the permissible scope of the search." *United States v. Garrido-Santana*, 360 F.3d 565, 575 (6th Cir. 2004) (quoting *United States v. Gant,* 112 F.3d 239, 242 (6th Cir. 1997)). "The scope of a search is generally defined by its expressed object." *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (citing *United States v. Ross,* 456 U.S. 798, 820-21 (1982)). Moreover, the consenting party "may of course delimit as he chooses the scope of the search to which he consents." *Jimeno*, 500 U.S. at 252. "The standard for measuring the scope of a [person's] consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the [consenting party]?" *Id.* at 251 (citing *Illinois v. Rodriguez*, 497 U.S. 177, 183-189 (1990)).

### 1. *Reja Faulkner's Consent*

#### a. <u>Validity of Consent</u>

The Court first looks to whether Ms. Faulkner gave valid and voluntary consent for officers to search the Ringgold apartment.

Here, Ms. Faulkner was in her late 20s at the time of the November 2017 search.[6] Both in the body-worn camera footage and at the suppression hearing, Ms. Faulkner demonstrated her competence and understanding of the circumstances presented. Moreover, throughout her interaction with the officers, Ms. Faulkner did not hesitate to

---

[6] Ms. Faulkner stated that she was 29 years old at the time of the May 8, 2019 suppression hearing. (Doc. 24 at 5).

vocalize her questions and concerns as they arose. This Court has no concern regarding Ms. Faulkner's capacity to comprehend the nature and significance of her consent, nor does the Court find that any personal characteristics rendered Ms. Faulkner susceptible to confusion or coercion.

The Court further finds that Ms. Faulkner understood her constitutional rights, as well as her right to refuse the search. Indeed, Ms. Faulkner testified that Officer Maloney explained the officers' alternative option of seeking a warrant. The argument presented here does not question Ms. Faulkner's understanding of her rights, but whether she was led to forfeit those rights through coercive means.

The Court also finds that the length and nature of detention were neither extended nor coercive. Based on the body-worn camera footage, the entirety of Ms. Faulkner's pre-search interactions with law enforcement lasted approximately 30 minutes. Moreover, the first conversation between Ms. Faulkner and Officer Maloney—during which Ms. Faulkner agreed to call Defendant out of the apartment and to allow the officers to enter—occurred roughly 15 minutes after officers arrived at the scene. Further, as Officer Maloney testified, conversations with Ms. Faulkner occurred away from other officers in order to minimize any feelings of intimidation. And at no point was Ms. Faulkner physically restrained, nor is there any assertion that she was compelled to speak to the officers. Indeed, when officers first arrived, Ms. Faulkner exited her vehicle and walked into the Ringgold apartment, only to voluntarily reemerge from the apartment a short while later, despite the officers' continued presence outside. Finally, the only time Ms. Faulkner's freedom of movement was curtailed in any capacity was

when officers stopped her from re-entering the apartment for her own safety. Accordingly, the length and nature of detention were appropriate and did not render the interaction coercive.

Finally, the Court finds that the officers did not use coercive or punishing conduct to secure Ms. Faulkner's consent. Specifically, the Court finds Ms. Faulkner's assertions that Officer Maloney coerced her consent by threatening to take her children away to be unsupported by the evidence and not credible. While the entirety of the conversations between Officer Maloney and Ms. Faulkner were not captured on camera, the portions that were captured do not evidence any such threats. Moreover, Ms. Faulkner's conduct, demeanor, and statements after each conversation with Officer Maloney belie the assertion that Officer Maloney made any such threats. Indeed, after her first conversation with Officer Maloney, Ms. Faulkner went on to deny that anyone spoke to her about consent at all (which denial is, in and of itself, contradicted by the evidence), let alone that she was threatened into consenting.

Moreover, Officer Maloney's statement to Ms. Faulkner that the officers could seek a search warrant as an alternative to Ms. Faulkner's consent was not coercive. "It is well-settled that [a law enforcement officer's] statements to the effect that [s]he would obtain a warrant if [an individual] did not consent to [a] search does not taint [the individual's subsequent] consent," unless the statements are baseless or pretextual. *United States v. Salvo*, 133 F.3d 943, 954 (6th Cir. 1998) (collecting cases).

Here, the testimony and the body-worn camera footage evidence that Lt. Schofield believed there was probable cause upon which to seek a warrant and that he would not

have hesitated to do so if the officers had not received Ms. Faulkner's full consent to search. Further, the Court finds there was in fact ample probable cause upon which the officers could have obtained a warrant to search the Ringgold apartment for the rifle and the remaining firearms as well. Specifically, upon arriving at the Ringgold apartment to investigate a report of shots fired, CPD officers observed six rifle shell casings in the alleyway, just a few yards away from where they encountered Ms. Faulkner, who admitted to the officers that she had been smoking marijuana in her car when the shots were fired and that she owned three firearms, including a rifle, which she kept in the Ringgold apartment where she resided. Even if Ms. Faulkner lawfully owned the firearms, it was unlawful for her (or anyone else) to have discharged any of the firearms on a public road, or at or near an inhabited dwelling, no less while under the influence of marijuana. *See* Ohio Rev. Code §§ 2923.15, 2923.161, 2923.162. Thus, Ms. Faulkner's very first interaction with the officers already provided sufficient probable cause that a crime had occurred and that evidence of the crime could be found in the Ringgold apartment. Moreover, through subsequent conversations, the officers came to learn that Defendant, who was staying in the Ringgold apartment, was a convicted felon and was therefore prohibited from being in actual or constructive possession of any firearms. *See* Ohio Rev. Code § 2923.13; 18 U.S.C. § 922(g)(1). In short, Officer Maloney's statement that the officers could seek a search warrant as an alternative to Ms. Faulkner's consent was hardly baseless or an idle threat.

In sum, the Court finds that the Government has shown, through clear and positive testimony, supported by the evidence, that Ms. Faulkner knowingly and voluntarily

consented to officers searching for and retrieving the firearms from the Ringgold apartment, and that the consent was not obtained through threats or coercion. The testimony presented and supported by the evidence shows that Ms. Faulkner, at best, initially misunderstood whether she would be permitted to accompany officers during the search and that Ms. Faulkner expressed concern over the officers entering her home alone while her daughter was asleep upstairs. The testimony presented and supported by the evidence further shows that the officers did not proceed to enter the Ringgold apartment upon learning of Ms. Faulkner's possible confusion and that they once again explained the circumstances and options to Ms. Faulkner, in an effort to secure knowing consent, which consent they did in fact obtain before entering the apartment. Finally, the testimony presented and supported by the evidence shows that Ms. Faulkner's consent was more than mere acquiescence, as Ms. Faulkner actively cooperated with the officers' efforts to remove inhabitants from the apartment and to locate the firearms.

Accordingly, the Court finds that Reja Faulkner's consent was knowingly and voluntarily given, was more than the product of mere acquiescence, was not the result of any threats or coercion, and was therefore valid.

b. Scope of Consent

The Court next turns to whether the officers' search exceeded the scope of Ms. Faulkner's consent.

Under the objective standard, the Court must consider what a reasonable person would have understood from the exchange between Officer Maloney and Ms. Faulkner. Here, while the object of the officers' investigation initially was the firearm responsible

for the shots fired call, Ms. Faulkner's interactions with the officers, including the repeated discussion of multiple firearms and their locations in the home, would have lead a reasonable person to conclude that the search was not limited to the rifle alone.

Moreover, the Court finds that the testimony and evidence presented do not support the contention that Ms. Faulkner intended or understood her consent to be limited to the rifle alone. Indeed, in consenting to the search, Ms. Faulkner specifically identified for Officer Maloney the location of each of the three firearms. This disclosure belies the assertion that Ms. Faulkner intended to limit her consent to the rifle only. Moreover, even assuming *arguendo* that Ms. Faulkner initially misunderstood the officers' intent to seize all three firearms, surely she would have objected or at least questioned the seizure of the additional firearms upon learning that the officers had run afoul of her intended limitations. However, the evidence shows that Ms. Faulkner raised no such objection.

Defendant also argues that the CPD's Investigative and Trial Preparation Reports refer to searching for "the firearm" (singular), thus supporting the position that the search was limited in scope to the rifle. The Reports state in relevant part that:

> While canvassing the area Lt Schofield located six .223 rounds close to the apartment door. Office[r]s then asked Faulkner who else was in the apartment and she stated her boyfriend. Officers asked her if she had any guns in her apartment she was hesitant to answer then replied yes. She was asked if there was a riffle [sic] inside the location and she stated yes. Officers asked Faulkner for consent to go into the apartment to retrieve the <u>firearm</u> and she agreed to let officers in. … Once inside officers found 2 hand guns and a riffle [sic].

(Def. Exs. A and B) (emphasis added).[7]

As an initial matter, the Court notes that the language contained in the report is reflective of the officers' primary objective, which was to locate the rifle apparently responsible for the shots fired and the shell casings found in the alley. However, the primary focus of the officers' initial investigation does not speak to whether Ms. Faulkner expressly limited the scope of her consent following her interactions with Officer Maloney.

Moreover, even assuming that Ms. Faulkner had in fact limited the scope of her consent to the rifle only, that limitation would not preclude the officers from seizing evidence of other crimes that they encountered in plain view. The plain view doctrine applies if: (1) the item to be seized is in plain view; (2) the officer is legally present in the location from which the item can be plainly seen; (3) the incriminating nature of the item is immediately apparent; and (4) the officer has the right to access the object. *United States v. Garcia*, 496 F.3d 495, 508 (6th Cir. 2007) (citing *Horton v. California*, 496 U.S. 128, 136-37 (1990)). In other words, "'plain view' provides grounds for seizure of an item when an officer's access to an object has some prior justification under the Fourth Amendment." *Id.* However, "[t]he seizure of an item in plain view 'is legitimate only where it is immediately apparent to the police that they have evidence before them.'" *Id.* at 510.

---

[7] The same statement appears verbatim in both the Investigative Report and the Trial Preparation Report. (Def. Exs. A and B).

Here, the firearm found on top of the refrigerator was in plain view and was quickly observed by Lt. Schofield. The second firearm was located while searching for the rifle. Moreover, the officers were legally present in the location, given that Ms. Faulkner had consented to the officers entering the apartment (even if only for the rifle). Also, the incriminating nature of the two additional firearms was immediately apparent to the officers during the search, based on the officers' knowledge that Defendant and Mr. Cook were prohibited from possessing firearms due to their prior felony convictions.[8] *See United States v. Flores*, 193 F. App'x 597, 604 (6th Cir. 2006) ("[Because] the officers knew Flores was a convicted felon who could not lawfully possess a firearm … the criminal nature of the gun was immediately apparent to the officers, and the plain view exception applies, making seizure of the gun appropriate"). Finally, the officers had the right to access the firearm, given that no additional intrusion was required to accomplish the seizure and the officers could not have reasonably left the evidence to collect at a later time.[9]

---

[8] Although Mr. Turnage also had prior felony convictions, it is not apparent that the officers knew this information at the time of the search.

[9] Given Ms. Faulkner's prior failure to disclose the presence of all occupants in the home, and because Ms. Faulkner's two-year old daughter was asleep in the next room, the Court notes that, at the very least, the officers would have been justified in temporarily seizing the firearms for safety, which seizure ultimately would have ripened into authority to permanently seize the firearms once the officers learned that one of the firearms stolen, in addition to their knowledge of the occupants' felony convictions. *See Flores*, 193 F.App'x at 604-05; *United States v. Frederick*, 152 F. App'x 470, 472 (6th Cir. 2005) ("In applying the exception for 'objects dangerous in themselves,' we have said that 'a police officer who discovers a weapon in plain view may at least temporarily seize that weapon if a reasonable officer would believe, based on specific and articulable facts, that the weapon poses an immediate threat to officer or public safety'") (quoting *United States v. Bishop,* 338 F.3d 623, 628 (6th Cir. 2003)).

In sum, the Court finds that the officers' search did not exceed the scope that would have been reasonably understood in light of the conversations between Officer Maloney and Ms. Faulkner. Moreover, the Court finds that the evidence belies Ms. Faulkner's assertion that she limited the scope of her consent to the rifle only. Finally, even if the scope of the search was limited, the additional firearms were subject to seizure under the plain view doctrine. Accordingly, suppression is not warranted.

## 2. *Defendant's Failure to Refuse Consent*

In a co-habitation setting, officer may rely on the consent to search given by an individual who has actual or apparent common authority over the place to be searched or thing to be seized. *United States v. Caldwell*, 518 F.3d 426, 429 (6th Cir. 2008) (citations omitted). Nor are police officers "required … to take affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received." *Georgia v. Randolph*, 547 U.S. 103, 122 (2006). However, "a physically present inhabitant's **express** refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." *Id.* at 122–23 (emphasis added).

Here, Defendant was physically present at the Ringgold apartment prior to and during the search. Moreover, Defendant was in the immediate presence of the officers and Ms. Faulkner during conversations regarding her consent to search. Indeed, on one occasion, Ms. Faulkner specifically asked Defendant, in the presence of the officers, where her rifle was located, to which Defendant responded that the rifle could be found in the bedroom. And, crucially, Defendant was present when Ms. Faulkner expressed hesitation over the officers' entry into the home. Despite his presence and his knowledge

22

of the intended search, at no time did Defendant ever object or express refusal.  Thus, having obtained consent to search from Ms. Faulkner, who was known to be the actual resident of the Ringgold apartment and the owner of the firearms, and having received no indication from Defendant that he objected to the search, the officers appropriately relied upon the knowing, voluntary, and valid consent of Ms. Faulkner and, accordingly, suppression is not warranted.

## V.  CONCLUSION

Based upon the foregoing, Defendant's motion to suppress (Doc. 18) is **DENIED.**

**IT IS SO ORDERED.**

Date:  July 31, 2019                            *s/ Timothy S. Black*
                                               Timothy S. Black
                                               United States District Judge